FRANCIS J. FITZGERALD *vs.* SARAH G. BRENNAN.

Suffolk.   November 15, 1934. — June 24, 1935.

Present: RUGG, C.J., CROSBY, PIERCE, DONAHUE, & LUMMUS, JJ.

*Negligence,* Motor vehicle, Contributory, In use of way. *Proximate Cause.*

The questions of the defendant's negligence and of the plaintiff's due care were properly submitted to the jury on conflicting evidence at the trial of an action for personal injuries sustained by a boy who was struck on a street by an automobile operated by the defendant.

The evidence did not warrant a finding that there was a causal connection between a lacerated scalp wound and minor abrasions suffered by a boy in an accident and a rheumatic ailment and heart trouble which first developed about a month after the accident.

TORT.   Writ dated September 30, 1929.

The action was tried in the Superior Court before *Keating, J.,* who reported it for determination by this court as described.in the opinion. Material evidence is stated in the opinion.

*S. Abrams,* (*N. F. Fermoyle* with him,) for the defendant.
*F. R. Walsh,* for the plaintiff.

.CROSBY, J.   This is an action of tort to recover for personal injuries sustained by the plaintiff as the result of alleged negligence of the defendant. The defendant's answer is a general denial and contributory negligence. The case is before this court on a report which contains all the evidence material to the issues of law presented.

The accident occurred on March 24, 1929, shortly after five o'clock in the afternoon on Presentation Road, a public way in Boston. The defendant, who was called as a witness by the plaintiff, testified that at the time of the accident she was operating a motor vehicle which was registered in

her name, and that she had a license to operate motor vehicles. She further testified in substance as follows: When she first saw the plaintiff, a boy, he was running back and forth across the street. She did not see him alone before he was struck; there were twenty boys running across the street back and forth when she was four hundred twenty feet away from the place of the accident. She was going twelve miles an hour when she arrived at the intersection of Hunnewell Avenue with Presentation Road; and at the time of contact was going around twelve miles an hour in second gear. There was no other automobile on the road as she traversed the distance from the northeast corner of Hunnewell Avenue, and nothing interfered with her view as she saw boys running back and forth. None of the boys was in the street when her automobile was ten feet from the point where the plaintiff was struck; the boys were then on both sides of the sidewalk. She did not think there was any person in the street when the front of her automobile was twenty feet from the place of contact. She did not increase her speed at any time. She saw the group of twenty boys when she was fifty-five feet from where the plaintiff was struck but nobody was in the street. She blew her horn when she arrived at the corner of the street and blew it continuously, although no boys were in the street, because she had seen them running before and wanted to warn them. The first she saw of the plaintiff was when her automobile passed the group, "and out of the corner of her eye she saw a figure move. As she passed the corner, the group on her right was on the curbstone. She judged that the right hand side of her car was approximately nine or ten feet from the curbing on its right as she travelled the last fifteen feet . . . before the plaintiff was struck . . . ." Half the group of twenty were on the right hand and half were on the left hand curb. She did not know where the plaintiff was at the time the front of her automobile was five feet from the place where he was struck. It was not getting dark, the road was dry, and her brakes were in perfect condition. The right rear fender came in contact with the plaintiff. The defendant

applied the brakes, stopped the automobile and alighted. The automobile was then toward the center of the street. She saw the plaintiff to the right of the rear of the automobile and he was sitting up with a cut in his forehead and was bleeding. She went to the police station and reported the accident.

The plaintiff testified in substance as follows: He was ten years old at the time of the trial and was six years old at the time of the accident. Before the accident he was on the sidewalk, intending to cross the street. No one was with him as all the other boys were playing. Before starting to cross he looked in all directions and did not see any automobile coming, and he could see as far as a house approximately four hundred ten feet away. He was three quarters of the way across when he was hit. He did not see the automobile at all before it hit him, nor hear any horn blown. There were no other vehicles in the street from the time he left the sidewalk until he was struck, and nobody was with him at that time. There were some boys on each side of the street before he started to cross. He was not playing in the street at any time on that day, and it was sufficiently light so that he could see to his left for some distance before he started to cross the street. On redirect examination he stated that he looked carefully and did not see an automobile; that he walked across at a gait agreed to by counsel as being two miles an hour, and did not change his speed before he was struck; that he did not look again after leaving the sidewalk. He further testified: The next thing he remembered was being in his house and his father was bathing his head with cold cloths. October 17, 1933, was the first day he had been out of the house since February, 1933, except to go to the hospital three or four times. The last time he was confined at the hospital for six months. From February, 1933, to October 17, 1933, he stayed up only half the day and had a rest· hour. He was still being treated by Dr. Merlin. He further testified to treatment in hospitals until February, 1933, and that thereafter until the time of the trial he was confined to his bed except for three or four hours each day.

There was other evidence offered by the plaintiff tending to show that the defendant's automobile at the time of the accident was proceeding at a speed of from twenty to twenty-five miles an hour before the plaintiff was struck, and that the horn was not sounded before that time.

There was evidence offered by the defendant tending to show that she sounded her horn, that she was travelling at a speed of about ten miles an hour, that the plaintiff collided with the right side of her automobile, and that at the time of the accident he was playing in the street with other boys. Two officers called by the defendant testified that the plaintiff told them that he was playing in the street and that another boy pushed him against the automobile.

Upon the conflicting evidence the trial judge properly submitted to the jury the questions whether the plaintiff was in the exercise of due care, and whether the defendant was negligent. The plaintiff at the time of the accident was nearly six years old. He testified that he intended to cross the street and that before he started to cross he looked in all directions and saw no automobile coming. He was required to exercise the degree of care ordinarily to be expected of a boy of his age. It could be found that he had gone three quarters of the way across before he was struck by the defendant's automobile and that he did not see the automobile before he was struck. Upon this evidence it could not properly have been ruled that he was not in the exercise of due care. That question was properly submitted to the jury. *Patrick* v. *Deziel,* 223 Mass. 505. *Jeddrey* v. *Boston & Northern Street Railway,* 198 Mass. 232, 234, 235. *Kaminski* v. *Fournier,* 235 Mass. 51, 54. *Puccia* v. *Sevigne,* 258 Mass. 234. *Jean* v. *Nester,* 261 Mass. 442. *Milbury* v. *Turner Centre System,* 274 Mass. 358, 363. There was evidence of negligence of the defendant. *Boni* v. *Goldstein,* 276 Mass. 372, 376, and cases cited. *Stacy* v. *Dorchester Awning Co.* 290 Mass. 356. Although she testified that she was travelling at a speed of twelve miles an hour, there was evidence that she was operating her automobile at a speed of from twenty to twenty-five miles an hour when the plaintiff attempted to cross the street.

The question remains as to whether there was any evidence that warranted a finding that the rheumatic disease from which the plaintiff suffered was the immediate and direct result of the accident. There was medical testimony respecting the plaintiff's condition after the injury and at the time of the trial.

Dr. George F. Keenan, called as a witness for the plaintiff, testified that he had been a physician and surgeon for twenty-seven years; that he had an extensive hospital experience; that he saw the plaintiff on March 24, 1929; that the plaintiff had a lacerated wound of the scalp; that he was nervous and frightened and had a few abrasions on his face besides the lacerated wound; that there were no abnormal reflexes indicating any serious skull injury; that two stitches were taken; that he did not examine the plaintiff's heart; that he saw the plaintiff three days later; that there was some swelling of the area around the wound, his eyes were puffed and swollen and it was evident that there was some infection in the wound; that the stitch was removed and some material let out, and boric acid pads were put on; that the principal complaint was pain about the wound; that the witness saw the plaintiff at intervals of two or three days until the swelling was entirely gone; that he saw him ten or fifteen times; that the scar would be permanent; that at the time he discharged the plaintiff the wound was healed and so far as could be seen was all right; that his general condition "was such that he knew that Dr. Dunphy was recommended to take care of him; what at the time seemed to be rheumatism"; that there was no perceptible loss of weight from the time the plaintiff was first treated until the witness discharged him; that the plaintiff never complained to him of any rheumatic condition. This witness testified on cross-examination that on April 30 the wound had entirely healed and the plaintiff was discharged; and that from the time he first saw the plaintiff until April 30, 1929, he saw nothing to treat except laceration of the scalp.

The plaintiff contends that this rheumatic condition resulted from the accident and to substantiate that contention

relies upon the testimony of Dr. Samuel A. Merlin whom he called as a witness. Dr. Merlin testified that he was in the general practice of medicine, but most of his work was confined to the heart; that he first saw the plaintiff in April, 1930; that he saw him at a hospital and occasionally at the Children's Hospital clinic, and about three times at the plaintiff's home; that the first time he saw the plaintiff he was suffering from rheumatic heart disease with "mitral stenosis and regurgitation and that was a sub-acute condition." He was asked if in his opinion the sub-acute rheumatic condition was caused by the accident and answered that the trauma in itself did not cause it. He stated that either directly or indirectly trauma was an adequate cause for the condition. He gave as his opinion that the ultimate prognosis of the plaintiff "is very grave; that it is just a question of time; may be six months, a year or two or three," but that he did not believe the plaintiff will grow up to manhood; that he will probably die before he reaches the age of fifteen or sixteen years at the most. On cross-examination this witness testified "that it was his opinion that because of what happened to the child, a germ which was in his system lighted up . . . that the location of the cut was not of significance in lighting up the disease . . . that he thought the cut was a contributing factor and is one of the causes, but that it was not the definite cause of the rheumatic fever; that the direct definite cause of the rheumatic fever was the infection." This witness further testified that "so far as the source of infection is concerned, the cut on the head was out . . . [that he] didn't know whether the plaintiff had these germs in his system when he suffered the accident . . . [and that he] had no opinion as to whether or not the germs entered the child's system after the accident and had no opinion as to when the germs entered the plaintiff's system, but just reasoned they got in there sometime." He further testified "that he had testified previously that the shock of the accident was accountable for the lighting up of this disease; that is to say that the plaintiff was so weakened in his powers of resistance that this disease grew up in it or came to a head. He said that if he was sound about

that, then it must have come to a head or lighted up while the child was in a state of shock. He stated that as he pictured this case in his mind the plaintiff was in a state of shock for a month after this accident and his opinion was based upon that assumption." He further testified that if "the plaintiff got this cut in the head and no other consequential injury and got about shortly after that and appeared to a competent physician to have fully recovered, then his opinion must change. He stated that if the Children's Hospital record stated in the history sheet, 'Struck by an automobile on March 24, 1929, and received a laceration of the skull. No bad effects were noted,' were true, his opinion must change because the type of injury that there must be to account for the theory advanced by the witness is that the accident must have had such a severe effect on a person that the person's capacity to fight off disease has been appreciably diminished." The testimony of Dr. Merlin does not tend to show that the rheumatic condition of the plaintiff is due to the cut which he received in his forehead for the reasons that there is no evidence that the plaintiff at any time after the accident was in a condition of shock; and it appears from the hospital record that "No bad effects were noted" from the injury. Consequently there are no facts to warrant a finding on the theory of Dr. Merlin that the plaintiff's rheumatic condition was due to the cut on his forehead. The rheumatic symptoms of the plaintiff testified to by his mother appeared for the first time about four weeks after the accident. There was no evidence which would warrant a finding that the plaintiff's rheumatic condition was due to or caused by the accident and the jury properly should have been so instructed.

Margaret M. Fitzgerald, the mother of the plaintiff, testified that before the accident he never had been ill; that Dr. Dunphy started treating the plaintiff about a month after Dr. Keenan concluded; that Dr. Dunphy commenced treating the plaintiff the latter part of April, 1929, and continued to do so for quite a while; that the first time she noticed any swelling in the plaintiff's joints was about four weeks after the accident; that he missed no days

during the school term before the accident; that she never had observed any enlarged condition of his tonsils.

The defendant called as a witness Dr. George V. Buehler who testified that he was a physician and surgeon with extensive experience; that he first examined the plaintiff on April 8, 1929; that the family history he then obtained was practically negative; that Dr. Keenan told him that he found a contusion of the left ankle, abrasions of the left cheek, and lacerations of the left forehead, in which he had placed two stitches and removed them the following week; that there were no fractures, and no X-rays were taken; that he inquired of the plaintiff as to his complaints, and the plaintiff told him that "he had had headaches for a few days; had had no vomiting; that he ate pretty good; and did not complain of his ankle, but he was a little nervous and he did not sleep very well." This witness further testified that he made an examination of the plaintiff which revealed the plaintiff's general condition as negative except for some hypertrophic tonsils; that the significance of that condition of the tonsils was that it is generally an indication of some infection; that he then examined the plaintiff as to the places where Dr. Keenan said he was injured; that there was nothing to be seen on the plaintiff's left ankle; that there were no marks or scars; that on the left cheek there was no mark to be seen; that there was a wound on the outer side of the left forehead which was healing; that this cut was about an inch long and about half an inch wide; that the opinion of the witness then formed was that the plaintiff had sustained some abrasions of the cheek which had healed and not left any marks; that he had some possible injury to the left ankle which had also healed without leaving any marks, and had sustained a wound on the left forehead which had been closed and was then healing. This witness further testified that he examined the plaintiff again on July 19, 1929; that Dr. Dunphy was present and gave the witness his diagnosis, stating that the plaintiff had a typical rheumatic fever, with a temperature ranging from one hundred one to one hundred three and a half, which went from one joint to

another, and had an acute endocarditis, and that he had had a mitral murmur two weeks previously. This witness further testified that his examination disclosed a very marked trouble with the plaintiff's heart which was apparently enlarged; that his tonsils were enlarged and infected; that his pulse was rapid and some of his teeth were decayed; that the first time he saw the plaintiff he was in very good condition apart from the infected tonsils; that the second time the witness examined him he was sick in bed with swollen wrists and a bad heart; that when he saw the plaintiff the second time he was of opinion that he "had a joint infection, with involvement of the lining of the heart; heart trouble, or rheumatism, consistent with Dr. Dunphy's diagnosis." The witness was of opinion that there was no causal relation between the accident and the rheumatic condition and stated his reasons for that conclusion.

Dr. William J. Brickley was called as a witness for the defendant. The record recites that he qualified as a physician and surgeon of large experience and had been associate medical examiner of Suffolk County since 1920; that he had examined a transcript of the testimony of Dr. Keenan and of Dr. Merlin and had seen a copy of the Children's Hospital record. He testified in direct examination that the plaintiff did not receive the infection of rheumatism through the cut on his head and gave his reasons for that opinion, stating that the cut was not the type of infection following a puncture and giving his reasons for that opinion. He testified that out of two hundred eighty thousand cases he never had seen anyone that had rheumatic infection arising from the type of wound in this case, and that in his judgment it could not occur; that, in his opinion, from the history of the case this accident to the plaintiff did not conduce or bring about directly or indirectly this rheumatic fever. The witness stated at length his reasons for that opinion, which need not here be recited. He further testified that the "heart troubles" of the plaintiff "are offshoots of this rheumatic infection and are part and parcel of it."

At the close of the evidence the defendant presented a

motion for a directed verdict in her favor. This motion was denied subject to the defendant's exception. The following questions were submitted to the jury: "1. Was the rheumatic disease from which the plaintiff suffered after the accident the immediate and direct result of the injuries sustained by the boy at the time of the accident? 2. If the jury answer the first question in the affirmative — that is to say, if the jury answer the first question by saying 'Yes' — what reasonable compensation should the plaintiff receive for the pain and discomfort that he suffered in consequence of such rheumatic disease? 3. What reasonable compensation should the plaintiff receive for the pain which he suffered in consequence of the injury sustained by him at the time of the accident, other than the rheumatic disease?" The answer to the first question was "Yes." The answer to the second question was "Forty-three hundred dollars ($4300)." The answer to the third question was "Seventeen hundred dollars ($1700)." At the request of the defendant and with the assent of the plaintiff the case was reported by the trial judge to this court upon the following stipulation: "If the case ought not to have been submitted to the jury, judgment is to be entered for the defendant; if the trial judge was right in submitting the case to the jury, judgment is to be entered for the plaintiff for Seventeen Hundred Dollars ($1700) unless the Supreme Judicial Court should decide that the jury were warranted in finding upon the evidence that the rheumatic disease of the heart was the direct and immediate result of the injury sustained by the plaintiff at the time of the accident; and if the Supreme Judicial Court should decide that the jury were warranted in so finding, judgment is to be entered for the plaintiff for Six Thousand Dollars ($6000)."

In accordance with the terms of the stipulation of the parties judgment is to be entered for the plaintiff in the sum of $1,700.

*So ordered.*